173256. Please proceed. May it please the Court, Michael Gaffney for Appellant, Gregory Swinton. The District Court observed that a jury could reasonably find in favor of Mr. Swinton's unsubjective prong of his unsafe food claim, and that aspect of the ruling should be affirmed. As to the subjective prong, there are at least three genuine disputes in material fact. First, whether Dr. Wright learned of Mr. Swinton's request on March 1st, weeks earlier than Dr. Wright suggests, the District Court concluded. Second, whether the procedural hurdles that Dr. Wright points to were required. And third, whether even if the procedures identified by Mr. Wright as being inflexible, that a jury could find that they had already been satisfied given that Mr. Swinton had previously been on a diet. During each of these periods of delay, Mr. Swinton was forced to confront an untenable choice. Eat the food served and risk an anaphylactic reaction, or, as the District Court said in Johnson v. Harris, suffer like Tantalus and be served food that he could not eat. The March 1st notation, Your Honors, is enough to defeat summary judgment. A jury could find on the basis of that order alone. Did he raise that? Yes, Your Honor. Before Judge Underhill? Yes, Your Honor. So at JA 148, Mr. Swinton says that Wright, quote, failed to provide Plaintiff Swinton with his medical diet in a reasonable time, and he asserts that Dr. Wright knew as of February 27th, 2016. So the request was made on February 26th. There's a notation on February 27th, which is what Mr. Swinton is pointing to, that that request was forwarded to the doctor, and the March 1 notation is in response to, after that request was forwarded to the doctor, it appears to be Dr. Wright's signature. But more importantly, or perhaps as importantly, Mr. Swinton attached that March 1 notation to his complaint. And the notations reproduced it at reply 12, but this is JA 64 in the record. And Mr. Swinton explained the significance of the notation. He described the exhibits to his amended complaint. The significance, just so that we move on, is that it means it could be as long as six weeks. Three to six weeks is what we're disputing here. So you make that argument that that should be viewed in the light most favorable to your client. Then how do we go on from there? From that notation, Your Honor, from the fact that it could be, as you said, Your Honor, three to six weeks, that's enough for a jury to find both on the objective and the subjective prongs for Mr. Swinton. On the objective prong, the cases show ranges from seven to 14 days. And on the subjective prong, it would be enough to show that Dr. Wright knew of this risk and yet failed to act. Well, I'm not making a decision one way or the other, but I assume that it still turns on whether the six weeks, the outer limit, was a reasonable interval to secure Dr. Wu's okay. And that implicates both the time and the procedure. So if, unless there's a question of fact on whether or not that was reasonable, the March 1st date doesn't really get you there by itself, right? So there is a question of fact as to whether Dr. Wu's approval was required, Your Honor. That was a dispute. There's a dispute about that. But this was a summary judgment. And I gather that you have no evidence that says that it wasn't part of the protocol. And I'm especially concerned about it because the plaintiff, it appears from the record, had taken himself off the diet, I believe twice. And that might raise questions about the seriousness of his allergy and the need to maintain him on the diet. And so to that extent, I'm not sure why wanting Dr. Wu's inquiry wasn't appropriate. Let me respond to both points on that question, Your Honor. On the question about whether there's any factual dispute about whether Dr. Wu's approval was required, Mr. Swinton had previously been approved for a diet when he was at Bridgeport. Dr. Elderton is the doctor that approved that. And there's no mention of this at JA-203. He's approved the day after he arrives at Bridgeport. There's no evidence that Dr. Wu was consulted in advance of that approval. No, I understand that. And let me assume that, you know, when a prisoner comes in and presents with allergies, they put them on the diet because they don't want any risk. But when the prisoner himself is taking himself off the diet periodically, at that point when he asks to go back on, it seems to me they might have a reason to make further inquiry rather than just having a prisoner who, you know, this month is on, that month is off. Your client wasn't quite that willy-nilly. But you know what I mean. I hear the concern, Your Honor. And you're right that Dr. Wright pointed to two instances in which Mr. Swinton was off the diet. And let me just quickly cover both. The first one was on August 29, 2015. And it wasn't that he discontinued his diet. The form says that he just merely refused a meal. And that form says, quote, that Mr. Swinton may retract this refusal at any time, which is exactly what he's trying to do here in the second discontinuation. Now, the more recent discontinuation was the morning of February 17, 2016. By that night, he's transferred to Northern and he explains upon arrival that he would like to be put back on the allergen-free diet. In the notations where he asks in writing to be put back on the diet, he explains the context of why he asked to discontinue that diet and also the temporal nature of that discontinuation. He says that the reason for the discontinuation, and this is not disputed in the record, is that the correctional officers at Bridgeport were messing with his food, is what he says in his writing. I understand the rationale, but that is all developed after the fact. What I'm concerned about is when a doctor sees that a patient is asking to go back on a diet after himself having taken himself off for whatever reason, is it reasonable for the doctor to, you know, have this more searching inquiry? I mean, after all, you've got an Eighth Amendment claim here, so you have to find more than, you have to demonstrate more than that this was negligence or that other doctors might have made a different call. Why is it not reasonable to have gone through these various steps for a prisoner who had taken himself off the diet? Agreed, Your Honor, that Mr. Swinton has to show more than negligence, and he can do that. Dr. Wright's never pointed to what you're describing as a reason for having jumped through these hoops. He's never said that the reason that outside documentation was required, despite the fact that it was in the medical file, that testing was required despite the fact that there was an EpiPen prescription, he's never pointed to the fact of that discontinuation, which lasted for less than one day, as a reason to go and revisit the nature of the allergies. There's no evidence in the record anywhere that shows that the doctor would have been reasonable to find that the allergies had subsided. The only thing, I think, Your Honor, would be if this discontinuation had lasted for perhaps a prolonged period and the doctor could point to that prolonged period and say, I see that my red light is on, Your Honor, if you'd like me to continue. If the doctor was able to point to, let's say, a six-month period where he was off the allergen-free diet and say, well, based on that and the fact that you discontinued six months ago, I no longer think this diet is necessary. If it is, we'll go through these additional steps and perform this testing. But there's nothing in the record that suggests that was the reason for Dr. Wright requiring any of these hoops to be jumped through. He doesn't explain that that's the reason for the delay from March 1st to March 22nd or even March 29th. And there's nothing in the record that suggests that his allergies weren't as serious as he says. In fact, it's undisputed that he would have an anaphylactic, or he could at least have an anaphylactic reaction if he ate egg or soy. And so the fact that he went off his diet for less than one day doesn't call into question the objective prong of the analysis. Really, it's really focused on the subjective prong right now. That's the focus. Yeah, and on the subjective prong, it's not as if Dr. Wright was any more reasonable because of the discontinuation. Imagine that Mr. Swinton had arrived at Northern and there was a mistake, that he was inadvertently left off of the allergen-free diet and he made a request to go on to that diet as he thought he still was on. What Dr. Wright would have done in that case that would have been, the thing that would not have been reckless would be to check the medical file, see on the first page that there's an anaphylactic reaction noted there, and to put him back on the diet. It would be reckless whether Mr. Swinton discontinued the diet voluntarily for half a day or whether it had been inadvertent. It would still be reckless for Dr. Wright to have reviewed that medical file and then taken three weeks of complete inaction, one week of nothing after the doctor's visit, and on March 29th saying outside documentation is required, despite the fact that there's documentation in the file. That's reckless. What I was going to say to you is that I know you're court-appointed, but it seems to me that the court would like to have seen more discovery in this case about some of the practices and procedures at the facility. If I understand your argument on subjectivity in particular, you're saying if they haven't come forward with evidence to demonstrate that there was this protocol, that it was followed in every case, that it was perhaps adopted after the Bridgeport admissions so that that explains it. If there's not evidence, that has to be viewed against them at this point. Is that the thrust of this? That's right, Your Honor, and you're right that there wasn't discovery in this case. We don't know, we don't have an explanation from Dr. Wu and Dr. Wright. They weren't deposed. Mr. Swinton tried three times to get an attorney below and was rebuffed. In Willie, when the court reviewed these various conditions of confinement, the path that it chose there was to send this back to the district court, in part because some of this material had to be fleshed out. But you're right, Your Honor, there's been no evidence to corroborate the say-so of the doctor that these policies had to be used in every case. No evidence other than the say-so. Other than the say-so, but there is conflicting evidence on each piece, on testing, on outside documentation, and on Wu's approval. Well, why don't we hear from the other side, and then we'll hear again from you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Matthew Beiser, Assistant Attorney General, on behalf of Defendant Dr. Wright. To address that point that my colleague left off with, if you look at the record JA-197 and JA-248, those are the two orders that were entered for the therapeutic diet, the first one by Dr. Elderkin at the Bridgeport facility, the second one by Dr. Wright at the Northern facility. The document itself is the same. It explicitly requires the approval of the head of correctional managed health care at UConn. That is the DOC policy. Dr. Wright prepared an affidavit which said that that was the DOC policy. No evidence was proffered to suggest anything to the contrary. But he went on the diet at Bridgeport right away, right? He went on the diet as soon as he came into Bridgeport, correct. Why was the approval that you just said was, in all cases, done within 24 hours that time and not done for three to six weeks on this last time? We don't know from the record what happened in 2015. But isn't it your burden to show . . . I mean, you're saying that this was reasonable. No, we have shown. Dr. Elderkin filled out the form that said, I referred this to correctional managed health care. I got my approval from correctional managed health care. Page, did you say that was on . . . I have a note here, JA197. Or excuse me, JA203. My apologies. And we're on this because I did look at this, and it looked to me as if the form was different for the first admission than the one that Dr. Wright filled out. Where does it say it requires the approval of others besides Dr. Elderkin? Yes, Your Honor. If you look at the very bottom right of the JA203, which is filled out by Dr. Elderkin, it says food allergy, and then it must be approved by CMHC, Director of Medical Services, or designated. I see. And if you look further down, it says there's even a sign-off that requires a discussion with the CMHC, Director of Medical Services, which Dr. Elderkin did on 8-14-15. That's the same form that Dr. Wright used when he put him on the special diet in April of 2016. That's right. But if he didn't – are you saying Dr. Wright had the approval for the diet the same day? No. Dr. Wright saw him on March 22nd, where he raised these complaints about his back. And he didn't get approval for the diet until April 14th, right? Well, on April 8th, the RAS testing was conducted. On April 12th, Dr. Wu was notified of the results, and on April 14th, Dr. Wright ordered the therapeutic diet. Let me ask you something. You know, this was not a new claim that he needed to be on the diet. He had been on the diet most of the time he was in the hospital or in the prison. To the extent there was now a concern as to whether he really needed to be on the diet, why wouldn't the appropriate course have been to put him on the diet, do all these tests, and if it turned out that he didn't really have a severe allergy, take him off it? But to not have him on the diet, why couldn't a jury find that reckless? Well, I don't think a jury could find it reckless. A jury could perhaps find it negligent. The reality of prison medical care is that inmates are constantly, and especially in regard to food and— I understand that, but to the extent that this is supposed to create a reaction that could be life-threatening, I would assume that, you know, that's why you put him on right away when he first went into the prison. Well, in retrospect, his condition wasn't life-threatening in any regard. If you look at the RAS testing, he had very mild allergies to these various foods. I understand that, but that's the testing that's done afterwards by Dr. Wright, that Dr. Wright orders, correct? Your Honor, with all due respect— No, I'm just trying to get the timing. Right. Did anybody know that the allergies were mild in March of 2000? There's no evidence in the record that he had any previous blood testing, RAS testing, prior to the one ordered by Dr. Wright. But I must not be making myself clear. Through March, no one knew how severe these were or were not. That's correct. But the prison had kept him on the diet for all of his time there except the two occasions, very brief, when he took himself off, right? That's correct. Now, before putting somebody back on, not who's asking for it for the first time, but who's been on it for months, you're saying it was a responsible thing to do to not have him on the diet until six weeks of testing was done or three weeks of testing was done? We would say three weeks, and I would say, respectfully, I would say it was very reasonable in the context of prison health care where inmates are constantly going on diets, claiming special diets, giving up on diets. It's a concern. But why doesn't that get to be a jury question? Because I think the most, as Judge Underhill said at the very end of his decision, at the very most, you have negligence here. Dr. Wright saw him once on March 22nd and started the process for this blood testing that was done within a two-week period of time. I think Judge Underhill was exactly right when he said you can't get to reckless. You're not saying that on admission they did blood testing and all of that, right? Because the answers were in 24 hours. The answer to put him on the diet was within 24 hours. Right. There was no previous blood testing. Right. The one ordered by Dr. Wu. Why now? Because of the DLC policy was that it goes to Dr. Wu at UConn. Dr. Wu, the court actually teed up a question for us to answer as to the policies that UConn used in regard to these referrals. And why Dr. Wu at this point? Well, Dr. Wu is the head of the medical services at UConn. He's the one who makes this determination based on the referral whether the therapeutic diet should be used. So Mr. Gaffney says that there's a genuine dispute about the protocol and how it works, or how it's supposed to work under these circumstances. And there seems to be some factual dispute about whether the protocol would have allowed the doctor here to give him a diet temporarily, subject to whatever further testing was undertaken or approved by Dr. Wu. I would respectfully respond that there is no dispute as to the protocol. The protocol requires the approval of the – we went through the forms. It requires the approval of Dr. Wu from UConn for the therapeutic diet. And are you saying, though, what I don't see in the record is Dr. Wu saying, when I got this request on March 22nd, I said, let's not do it until there's blood testing and whatever other confirmation I want. You didn't oppose Dr. Wu. I didn't see that anywhere in the record. You're exactly right, Your Honor. And this is not a lawsuit against Dr. Wu. This is not a lawsuit against UConn. No, but if the argument is that Dr. Wright acted reasonably because at that point it was out of his hands, Dr. Wu, he couldn't act without Dr. Wu's approval, and Dr. Wu hadn't given it, I would think that we need more evidence of that. This is a lawsuit against Dr. Wright. Dr. Wright is mandated, according to DOC policy, to get approval from Dr. Wu at UConn. Dr. Wright did exactly that. He did it within a short period of time. He sent it to Dr. Wu. Dr. Wu actually acted very quickly, determined that blood tests were necessary, got the blood tests, sent them back. Any claim to the procedure of Dr. Wu of UConn is, frankly, for another case. The question is, what did Dr. Wright do here? I would submit he did exactly what he was supposed to do. Would you just clarify something for me with respect to the crossed-out notation on, was it March 1st? Yes. Was that in the record before the district court? Was that? It was part of the, in fact, the defendants entered the plaintiff's entire medical record as part of their motion for summary judgment. So it was in our submission. It was never raised to Judge Underhill. There's never been a claim from anybody that Dr. Wright saw him on March 1st. They didn't raise this issue of the crossed-out entry before Judge Underhill. It is basically a new legal claim at this point. But how do, do we just ignore it? No, I, I. It appears to be his signature. Well, if you want to get into it, if you compare the signatures from when Dr. Wright sees him on 197. For some reason I can't find my record. I think your friend here is helping you. I apologize for that. Okay. Well, why don't you. Well, I'm sorry. I, I, I gravely apologize. Are we supposed to just ignore that? But I have it right. No, no. If you compare on JA 197, Your Honor, if you compare the March 1, 2006 entry, which is the scratched-out entry, with the handwriting on March 22, 16 right below it, which says, Dr. Wright, that's the one time Dr. Wright saw him. Okay? That's two different handwritings. You then go to JA 248. Well, I don't know what you're talking about. There's a signature upside down, Dr. Wright, for that entry on March 22nd. Correct. And it's also a scrawl. So, I, I mean, you know. And there's a. I'm not sure I can say that Dr. Wright didn't sign both of the, either of those. I, I, I totally agree. So, what we have is his name purportedly his signature, March 1st. We are on summary judgment, you know. The record gets viewed in the light most favorable to the plaintiff. I agree. You have a scratched-out entry that no one claims went into effect. By analogy, say, say your clerks here went to draft a decision immediately after that interesting artist argument we just heard, and started to draft a decision that was in favor of the plaintiff. And after discussing it with fellow clerks, discussing it with the person who's going to sign it. I don't disagree. It's got a signature. But we. It's got a signature. Well, the signature. Not just an entry where we don't know who made the entry. I'll give you that. There are lots of different handwritings putting in the clinical notes. And I would submit the. He's got his signature on each and every one of them. The signature I would submit is in response to the incorrect order being scratched off. Well, but, you know, your client didn't testify to that. Correct. We don't know. I mean, you can't ask us to assume facts favorable to you. Even if you accept everything in regard to the March 1 entry that's urged by my colleague, even if you accept it all, all that does is extend the period 21 days. The bottom line is that Dr. Wright saw him on the 22nd, was obligated to make the referral to UConn, made the referral to UConn, blood testing, therapeutic diet was ordered. I would submit that you don't get anywhere near the standard required under the Eighth Amendment, Your Honor. On the subjective front. Okay, thank you. Thank you. Thanks for helping me out. Your Honor, it's not disputed, at least in the briefing, that Mr. Swinton's allergies were serious. And at JA 196, this is the notation by Dr. Wright ultimately putting Mr. Swinton on the allergen-free diet. It says, What page again? 196. 196, Your Honor. I'm with you. In the bottom right corner, and this is the order by Dr. Wright again, in the bottom right corner it says food allergy, only for anaphylactic or other severe reactions. So there's no dispute. Look, part of the reason for me, at least, that this is a closed call is that if he had had such a reaction and been permanently disabled, we would be having a very different discussion, it seems to me. Correct, Your Honor. Just by luck, fortune, that he wore his own refusal to eat. Correct, Your Honor. That we are where we are today. But the question for me is we are talking about a violation of the Constitution. And we're then talking on the subjective prong about deliberate indifference to his needs, where Dr. Wright, unlike some other cases that we see, says, All right, well, you know, I'm going to take this seriously, but there is a protocol. And if it is true, let's assume for now that the protocol is what it is, and let's assume that there's no dispute about that, then how is that deliberate indifference? No, Your Honor, two ways. One, there's been a lot of hiding behind the protocol and Dr. Wu's necessary approval. Well, you can hide behind a protocol, but you can also follow a protocol. But the reason I characterize it that way, Your Honor, is that as of March 1st, from March 1st to March 22nd, the protocol wasn't being followed. There were no steps taken during those three weeks to follow the protocol. So you do ascribe real significance to that period between the 1st and the 22nd. Yes, Your Honor. So the notation becomes somewhat important to you. Yes, Your Honor, I think the notation is important, and the cases from Phelps and Willey and others in this court define deprivations of 7 to 14 days of much less severe issues, restricted diets where the diet might not be adequately nutritious, but there's not even a concern that if the inmate were to eat one portion of the tray that something . . . That was never argued to Judge Underhill, right? That was not the basis for ascribing deliberate indifference to Dr. Wright, that between March 1st and March 22nd he did nothing. Your Honor, as my friend says, they put this notation into the record, but also in the complaint when he was representing himself, Mr. Swinton did note the notation and said that that was the basis to find that Dr. Wright knew as of February 27th and that Dr. Wright should have taken action earlier. Excuse me, Mr. Gaffney, but where was that page again? That, Your Honor . . . You mentioned it earlier. No problem. It's somewhere. This is at JA 148. 148. And then the complaint exhibits are at JA 56. Okay. As to the inflexibility . . . As to these procedures and whether Dr. Elderkin had to get Dr. Wu's approval, as the government just said, a reasonable jury could conclude that if these procedures were as inflexible as the government suggests, then these procedures must have been completed in the first instance. Based on the foregoing reasons, Your Honors, the district court's order should be vacated and the case should be remanded for further proceedings. Thank you very much. Let me ask you one question. Yes, Your Honor. You might understand that your client's position is that he did not eat during this period between March 1st and when he ultimately was put on the diet? Your Honor, it's not clear. The sworn affidavit from a fellow inmate is that he saw him not eat substantial amounts of his food, but it's not clear . . . There's almost no variation in his weight. Okay. Thank you. Yes, Your Honor. Thank you. And we'll reserve the decision. I'd also like to thank you for taking this appointment on behalf of the court and the pro bono committee of the circuit. Thank you. Thank you, Your Honor. Thank you.